**IN THE COURT OF APPEALS OF IOWA**

No. 22-0515
Filed September 21, 2022

**IN THE INTERERST OF J.M. and C.S.,**
**Minor Children,**

**J.M., Mother,**
        Appellant.

_____

Appeal from the Iowa District Court for Floyd County, Karen Kaufman Salic, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Becky Wilson of O'Mara Wilson Law, PLLC, Mason City, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Mark Milder, Denver, attorney and guardian ad litem for minor children.

Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

The young mother in this appeal suffered physical, sexual, and emotional abuse at the hands of her adoptive father for most of her childhood. Because of this abuse, the mother has multiple mental-health diagnoses that have interfered with her ability to care for her two children—J.M., born in 2018, and C.S., born in 2019. Her parental rights to these children were terminated under Iowa Code section 232.116(1)(e), (h), and (k) (2021). The mother appeals, challenging the statutory grounds for termination, the efforts made to reunify her with the children, and the denial of her request for more time.[1] We affirm.

I. **Background Facts and Proceedings**

Beginning when she was four years old, and continuing until she was twenty, the mother was abused by her adoptive father. The abuse ended when she moved from Wyoming to Iowa to get away from him. She brought her two young children with her but soon after struggled to care for them.

The Iowa Department of Human Services became involved with the family in November 2020 when a report was made that a man believed to be J.M.'s father was using methamphetamine while caring for him.[2] While investigating this report, the department learned the mother had possibly given J.M. too much of his

---

[1] The mother does not argue that the children's best interests were affected under Iowa Code section 232.116(2) or that any of the permissive exceptions to termination in section 232.116(3) applied to her situation. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). We accordingly find it unnecessary to address those issues, though we touch on the children's best interests as part of our analysis of the mother's request for an extension of time. *See id.* ("The paramount concern in a termination proceeding is the child's best interests.").

[2] This man has since taken a paternity test and was determined to not be J.M.'s father. The actual biological father is unknown. C.S.'s reported father died before C.S. was born.

prescribed medication and failed to follow through with recommended therapy for both children. The department did not confirm the first allegation, but it did find the mother had neglected the children's medical care. The oldest child was especially in need of therapy due to developmental delays and severe behavioral issues that caused him to be aggressive toward others and himself.

The children were removed from the mother's care at the end of January 2021 after she told a caseworker from the department that she intended to leave the state. The department was also concerned about the mother's revelation that she suffered from dissociative-identity disorder with several distinct personalities, one of which was a four-year-old child. A later psychological evaluation added diagnoses of generalized anxiety disorder, depression, post-traumatic stress disorder, schizoaffective disorder, and stimulant-use disorder in sustained remission.[3] The psychologist believed "most of these disorders [were] the result of the childhood trauma" the mother experienced. In his opinion, although the mother's

> parenting knowledge and skills . . . appear to be relative[ly] normal, [her] rather severe mental health disorders may adversely impact her ability to implement good parenting behaviors. Her severe depression, perceptual distortions, anxiety, and unstable personality have the potential to put her children at great risk for neglect and, possibly, some form of abuse.

The psychologist recommended "intensive outpatient treatment," including "both psychiatric consultations regarding medication as well as intensive psychotherapy"

---

[3] The mother used cocaine and methamphetamine in her teenage years, but she reported being sober from those substances for six years. All of her random drug tests were negative.

that would ideally involve "Eye Movement Desensitization and Reprocessing (EMDR)" therapy.

After the children were adjudicated as in need of the court's assistance in February, the mother worked to set up the suggested treatment. She first reported that she was attending therapy regularly. The department later learned that was not true. The mother was also not consistent with her visits, often ending them early or canceling them altogether.

By the end of June, the mother reported that she was struggling financially, even though she also said that she was working full-time and paying $936 in child support. She was two months behind on her rent and planned to move out of her apartment, although she did not know where she would go. In August, the mother decided to move to Wyoming where her mother and other family members lived. Once there, the mother's participation in services decreased. She ignored phone calls from a family support specialist and did not begin video calls with the children until their foster parent reached out her. The mother did start therapy, but she was not consistently taking her medications, which resulted in several "black-out" periods where she said her other personalities took over.

As the mother became more settled in Wyoming, her phone and video contact with the children increased. And she came to Iowa about once a month for in-person visits with the children. But the visits were hard on the children, particularly the oldest, who experienced increased negative behaviors after contact with the mother. Though she was encouraged to do so, the mother did not participate in any of the children's therapies even while she was living in Iowa.

The State filed termination petitions, and a hearing was held in March 2022. Following the hearing, the juvenile court entered an order terminating the mother's rights under Iowa Code section 232.116(1), (e), (h), (k).

## II.     Standard of Review

"Termination proceedings are reviewed de novo." *L.B.*, 970 N.W.2d at 313. We give weight to the factual findings of the juvenile court but are not bound by them. *Id.* "The burden is on the State to show by clear and convincing evidence that the requirements for termination have been satisfied." *Id.*

## III.     Analysis

The mother's appeal focuses on whether the State proved the statutory grounds for termination by clear and convincing evidence.  Although she challenges the sufficiency of the evidence under each ground cited by the juvenile court, we confine our analysis to Iowa Code section 232.116(1)(h).  *See id.* (stating we need not address a step the parent has not disputed).  The mother contests only the last element of this ground—whether the children could safely be returned to her custody.  *See* Iowa Code § 232.116(1)(h)(4) (requiring "clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents"); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (stating this element is satisfied only if "the child could not be safely returned" to the parent "at the time of the termination hearing").

Concentrating on the positive, the mother argues the children could have been returned because she "obtained a full-time job, a residence, and is taking care of her mental health by therapy and medication management." We commend the mother for each of these things, especially her decision to start therapy again.

But she was still in the early stages of that therapy, which would take her a long time to complete. And until complete, the professionals involved in the case did not believe the children would be safe in her care.

The mother was also not stable in her housing or employment. She has lived in three places since moving to Wyoming, obtaining her most recent residence just a week before the termination hearing. The mother also typically bounced from job to job. She continued that pattern in Wyoming, reporting that she was fired from her first job there on suspicion of stealing alcohol, which she denied.

More concerning was the mother's lack of contact with the children once she moved to Wyoming in August 2021. The department's caseworker testified that one in-person visit a month was not enough "to really be able to adequately move forward," particularly considering the mother was still at fully supervised visits. *See In re M.W.*, 876 N.W.2d 212, 223–42 (Iowa 2016) (finding that failure "to progress to either semi-supervised or unsupervised" visits supported termination). The mother also failed to participate in the children's therapy, despite being encouraged to do so. This was the same concern that led to the confirmed child abuse allegation against the mother when the children were first removed from her care.

With this state of facts, we agree the State proved by clear and convincing evidence the children could not be returned to their mother's custody. Yet the mother claims that if the department had provided her with additional services— like a parent partner, unspecified "additional course materials," and home studies on family members—she could have been reunified with her children. *See In re*

*C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent."). Bypassing the State's error-preservation concerns,[4] we do not see how those other services would have conquered the main barriers to reunification—the mother's mental health and her residence in Wyoming. *See C.H.*, 652 N.W.2d at 147 ("Reasonable efforts are aimed at both preventing and eliminating the need for removal."); *see also In re M.P.*, No. 19-0995, 2019 WL 5063337, at *4 (Iowa Ct. App. Oct. 9, 2019) ("[T]he reasonable-efforts mandate does not create a menu from which discerning parents may order specific services."). Nor did the mother take full advantage of the services she was offered, which also defeats her reasonable-efforts claim. *See In re C.P.*, No. 18-1536, 2018 WL 6131242, at *3 (Iowa Ct. App. Nov. 21, 2018).

The mother alternatively claims the children could have been returned to her custody if she had been given six more months. *See* Iowa Code §§ 232.117(5) (stating that if the juvenile court does not terminate parental rights, it may enter an order under section 232.104(2)(b)); .104(2)(b) (allowing the juvenile court to continue placement of a child for an additional six months). A six-month extension is appropriate if the parent can establish that "the need for removal . . . will no

---

[4] The mother does not point out where in the record she requested these services, though the juvenile court's December 2021 permanency review order mentions some of them. *See In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002) ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding."); *see also* Iowa R. App. P. 6.201(1)(d) ("The petition on appeal shall substantially comply with form 5 in rule 6.1401."); Iowa R. App. P. 6.1401–Form 5 ("[S]tate what findings of fact or conclusions of law the district court made with which you disagree and why, generally referencing a particular part of the record, witnesses' testimony, or exhibits that support your position on appeal. . . .").

longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b); *accord In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021).

The mother's attorney asked the department's caseworker that question at the termination hearing: "So if the EMDR therapy is successful and makes good grounds, then it is quite possible that she could, within six months, be in a position to be able to have the children, do you believe?" The caseworker responded, "Oh, I would think it would take much longer than that. Talking with the therapist, I think it would take a significant amount of time." She continued,

> I mean, there's that mental health piece but we also have to work on her relationship with her children, and I know she's doing the phone calls, which is great . . . however, I mean, [J.M.] and [C.S.] need more. Following up with [J.M.'s] therapist is very important and that hasn't been done at all . . . . I've talked with the school and they just said that she was involved in that one IEP meeting so there's just many layers that need to be taken into account other than the mental health. That is a big portion of it, but we also have to make sure that we're meeting the children's needs, and their mental health is also very important.

We agree with the juvenile court that the mother failed to prove the children could safely be placed with her if given more time. Because the children had been out of the home for over twelve months at the time of the termination hearing, "we view the proceedings with a sense of urgency." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). Not only must the mother show the impediments to placing the children with her will not exist in six months, "we must also consider whether the further delay is in [the children's] best interests." *W.T.*, 967 N.W.2d at 323; *see also* Iowa Code § 232.116(2). Further delay is not in these children's best interests, considering the improvements they have made in their foster placement.

As J.M.'s therapist noted, despite his "recent ups and downs with his behavioral reports" after contact with his mother, he

> has been observed to be much more expressive, talkative, calmer, better mannered, and less angry or aggressive than he has been in the past. He displays improved self-control and better emotional regulation. He follows most commands given in sessions and accepts discipline calmly when necessary. He also demonstrates attachment towards his caregiver. [J.M.] still has developmental, social-emotional, and intellectual delays, but his improvements in treatment have been very significant.

We hope the mother experiences the same improvements from her treatments. But we can't expect the children to wait for her. *See In re M.D.*, No. 18-1659, 2019 WL 479142, at *1 (Iowa Ct. App. Feb. 6, 2019) ("Children are not equipped with pause buttons, and denying a child permanency in favor of a parent is contrary to the child's best interests."). We accordingly affirm the juvenile court's termination of the mother's parental rights to her two children.

**AFFIRMED.**